UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal Number: 05-430 (JGP) |
| | : | |
| v. | : | |
| | : | |
| | : | VIOLATION: 29 U.S.C. §439 |
| **RICHARD LYTER,** | : | (False Entry in Books and Records) |
| | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Richard Lyter and motion for a two-level decrease for acceptance of responsibility. As will be discussed below in more detail, the government: (1) moves for a two-level decrease in defendant's offense level because defendant appropriately accepted responsibility and requests that, pursuant to the plea agreement, the Court order defendant to pay restitution of $1,002.74 as stated in the Presentence Investigation Report ("PSR").

### I. FACTUAL BACKGROUND

On December 13, 2005, defendant Richard Lyter pled guilty before the Court to a one-count Indictment charging him with false entry in union record, in violation of 29 U.S.C. § 439.

As agreed to by defendant and set forth in the Statement of Offense and the Presentence Investigation Report ("PSR"), at pages 4-5, between April 1999, and March 2001, defendant was employed as the Executive Assistant to the General Secretary-Treasurer of the International Brotherhood of Teamsters (IBT) located at 25 Louisiana Avenue, N.W., Washington, D.C. The

IBT is an international labor organization representing approximately 1.4 million workers in various fields of employment and is subject to the Labor-Management Reporting and Disclosure Act of 1959. Defendant's duties as Executive Assistant to the General Secretary-Treasurer included developing budgets, updating the IBT's financial policies and reestablishing the IBT's internal financial controls, including policies relating to the use of IBT- issued credit cards.

While he was Executive Assistant to the General Secretary-Treasurer, defendant was issued an IBT credit card to use for expenses incurred in the course of conducting union business. The prevailing policies and procedures established at IBT made it clear that the credit card was not to be used for personal expenses. Personal expenses could not be charged on the union credit card then repaid at the end of the month. Union officials who incurred expenses while conducting union business were required to complete a voucher to be reimbursed for out of pocket expenses. A voucher also had to be completed to justify expenses incurred on a union credit card. When defendant charged a meal on his union credit card, he was required to write the appropriate information on the meal receipt and complete an activity report on the voucher listing details of the meal. These details included the date, time and place of the meal, the persons present at the meal and how the meal related to official union activity. After completing a voucher, defendant would submit the voucher to the General Secretary-Treasurer of the IBT for approval. The General Secretary-Treasurer, who had known defendant for more than 20 years, trusted defendant and signed off on defendant's vouchers without reviewing them.

In early 2001, the IBT requested that the Thomas Havey Company, an accounting firm, review expense reports for select IBT officers and personnel, which included defendant. SH of the Thomas Havey Company conducted the review of defendant's expense reports. While doing

2

so, SH noticed that his name and the names of other Thomas Havey Company partners were listed as having been present at meals on expense reports submitted by defendant. SH knew that the information on the expense reports was false because he had not been present at the meals where defendant had listed his name. SH contacted one of his partners, who stated to SH that he was not present at any of the meals where defendant had listed his name. SH then confronted defendant with these discrepancies. During that confrontation, defendant admitted to SH that he had falsified the expense reports and that the meals he claimed to have had with SH were actually personal meals defendant had with his wife. In a March 2001, letter to IBT's General President and the IBT Trustees, SH summarized his findings and placed the loss at approximately $3,800.

On March 13, 2001, defendant resigned from his position as Executive Assistant to the General Secretary-Treasurer at the IBT. At that time, defendant tendered a check to IBT in the amount of $3,400 which was intended to represent reimbursement for the personal meal expenses defendant improperly charged to his union credit card. Defendant subsequently reviewed copies of expense reports he had previously submitted for approval. Defendant indicated the personal portion of each charge on the relevant expense report then forwarded marked copies of the reports to his attorney. On July 23, 2001, defendant repaid an additional $9,734.50 to IBT for personal expenses he charged to his union credit card.

In March 2001, the IBT informed the Office of Labor-Management Standards (OLMS) of defendant's actions and provided OLMS with a copy of SH's March 2001 letter. The subsequent investigation conducted by the OLMS Washington District office revealed that from April 1999, when defendant was appointed Executive Assistant to the General Secretary-Treasurer, until he resigned his position in March 2001, defendant used the credit card issued to him by the IBT to

pay for over 300 personal meals. None of these charges had been authorized by the IBT. For each of these improperly charged meals, defendant submitted false expense reports to the IBT. In order to make the meals appear to be legitimate union expenditures, defendant completed the relevant expense reports with false business purposes and/or the names of IBT employees, officers and vendors who were not present at the meals. Defendant submitted each of the false expense reports to the IBT who subsequently provided defendant with monetary reimbursement for the costs of the meals. Defendant admitted to several IBT officials and vendors that he charged personal meals on his union credit card and then falsified expense vouchers to hide the fact that the meals were personal. During the less than two year period that he served as Executive Assistant to the General Secretary-Treasurer, defendant falsified over 300 expense vouchers and embezzled $14,137.24 in union funds by claiming personal meals as business expenses.

## II. UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines, § 3E1.1, provides for a two-level decrease in a defendant's offense level for acceptance of responsibility and, upon motion of the government, for a defendant whose level is 16 or greater and who has in a timely manner advised the government of defendant's intent to plead guilty, an additional one-level decrease. Defendant meets the criteria for a two-level decrease and the government hereby moves that the Court grant him a two-level decrease in his offense level for acceptance of responsibility.

The probation officer believes, and the United States concurs, that defendant's total offense level, incorporating the two-level decrease for acceptance of responsibility is 8, his criminal history is I, and his guideline range is 0 to 6 months of imprisonment. PSR, at pages 6-

7, ¶¶ 16-30, and page 14, ¶ 57. According to the PSR, defendant falls within Zone A of the Sentencing Table, which specifies that defendant is eligible for probation. Id., at page 14, ¶¶ 56-63.

### III. IMPACT OF U.S. v. BOOKER ON THE SENTENCING GUIDELINES

There are no facts involved in the calculation of defendant's sentence under the United States Sentencing Guidelines to which defendant did not admit in his guilty plea in this matter. Accordingly, there are no Sixth Amendment concerns in the calculation of his sentence under those Guidelines. However, the Supreme Court has now held that the Sentencing Guidelines are no longer mandatory. Nevertheless, for the reasons set forth below, the government requests that the Court use the Sentencing Guidelines in determining the sentence of defendant in this case.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). In consequence, the Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, § 3553(b)(1). Booker, 125 S. Ct. at 756; United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005). However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as a benchmark for informing courts as to what would be a reasonable sentence for a particular defendant who has committed a particular crime. The sentence will then be subject to review by courts of appeals for "reasonableness." See Booker, 125 S. Ct. at 766; Price, 409 F.3d at 441, 442.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law in order to calculate correctly a defendant's sentence under the existing Sentencing Guidelines.

See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)). See Price, 409 F.3d at 442-43. In light of this mandate, it is plain that a sentence within the Guidelines, while not required, is presumptively reasonable. Not only is a sentence within the Guidelines range presumptively reasonable, it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Price, 409 F.3d at 442 (listing the factors that guide sentencing).

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practices and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence.  See United States Sentencing Commission, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Every Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of

7

conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity").  Since the Guidelines represent the only extant benchmark to encourage uniformity and thus the only tool to implement the Congressional vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness."  See id. at 766; Price, 409 F.3d at 441, 442.  Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. § 3553(a) – provide the most concrete yardstick against which to measure what would be reasonable.  Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review.  See Section 3553(c) (mandating consideration of the Guidelines); Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); Section 3742(f)(2) (mandating court of appeals to set aside a

sentence outside the Guidelines range when the district court fails to provide a required statement of reason in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances.  In this case, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing.  Therefore, the government respectfully recommends that the Court sentence defendant according to the Guidelines.

### IV.  **RECOMMENDATIONS**

Defendant pled guilty to one count of false entry in union record for his role in a scheme to defraud the IBT by charging personal meals on his union issued credit card.  To conceal the fraud, defendant falsified over 300 expense vouchers during the less than two year period that he served as Executive Assistant to the General Secretary-Treasurer of the IBT.  Defendant's actions caused actual and intended losses in excess of $14,000.  This criminal conduct, with its resulting harm to the hard working members of the union was serious conduct that needs to be adequately punished.  Moreover, beyond the immediate financial losses suffered by the IBT, fraud by high-level executives has the effect of eroding the confidence of union members who place their trust in individuals like defendant to head their organization and adequately represent their interests.  Unfortunately, defendant's conduct has caused harm that will necessitate considerable effort to redress.

In this case, the government is requesting that the Court grant defendant a two-level decrease for acceptance of responsibility and order that defendant pay restitution.  As discussed above, defendant has appropriately accepted responsibility.  The resulting offense level as set forth in the PSR is 8.  With a criminal history category of I, defendant falls within the sentencing

range of 0 to 6 months.  Furthermore, in the plea agreement, at page 2, ¶ 4, defendant agreed to pay restitution to the victims of his crime.  Consistent with the agreement and the determination of the probation officer, the United States requests that the Court order defendant to pay restitution of $1,002.74 to the victim identified in the PSR, at page15, ¶¶ 70-71.

## V.  **CONCLUSION**

WHEREFORE, the government respectfully requests that the Court grant defendant a two-level decrease for acceptance of responsibility and order defendant to pay restitution in the amount determined in the Presentence Investigation Report.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney


_____
RONALD W. SHARPE
Assistant United States Attorney
Fraud and Public Corruption Section
D.C. Bar No. 434575
555 4th Street, N.W., Room 5828
Washington, D.C.  20530
(202) 353-9460
ronald.sharpe@usdoj.gov


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served by facsimile and first-class mail on counsel for defendant, Thomas Puccio, Esquire, 230 Park Avenue, Suite 301, New York, New York, 10169, this 22nd day of February 2006.